***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Gheen. Defendant has shown good grounds to reconsider the evidence; therefore, the Full Commission REVERSES the Opinion and Award of the Chief Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following which were entered into by the parties in a pretrial agreement as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act (hereinafter "Act").
2. An employee-employer relationship existed between the named plaintiff-employee, Eleanor M. Russo, and named defendant-employer, Food Lion, on July 1, 1999.
3. Food Lion is self-insured, administered through Risk Management Services.
4. The employee's right to compensation was admitted by a Form 60, indicating an injury date of July 1, 1999, and an average weekly wage of $468.01, producing a compensation rate of $312.02.
5. The depositions of Dr. Thomas Kern Carlton, Dr. Neil Conti, Dr. Kenneth Oswalt, Dr. James Post, and Dr. Zane Walsh are a part of the evidentiary record in this case.
 ***********
The following documents were admitted into evidence by the Chief Deputy Commissioner as:
 EXHIBITS
1. Stip. #1: Pretrial Agreement.
2. Stip. #2: Industrial Commission Forms.
3. Stip. #3: Medical Records.
4. Plaintiff's Exhibit #1: Letter from Michelle A. Smith to Plaintiff dated July 27, 2000.
5. Plaintiff's Exhibit #2: Letter from Derell Johnson to Plaintiff dated March 26, 2001.
6. Defendant's Exhibit #1: Vitae of Linda J. Christopher, R.N., CCM.
7. Defendant's Exhibit #2: Food Lion Customer Services Manager Job Description.
Subsequent to the deputy commissioner hearing the parties conducted a number of depositions. The parties secured additional medical records as part of the deposition process rendering the medical records contained in Stip. #3 incomplete. The parties resubmitted a complete package of medical records denominated: Stip. #4: Post Hearing Stipulated Medical Records.
 *********** PROCEDURAL HISTORY
Defendant filed a Form 24 Application to Terminate or Suspend Disability Benefits on September 27, 2000, contending plaintiff unjustifiably refused to return to work with defendant as of August 3, 2000. Plaintiff filed a Form 24 Response on October 6, 2000. A telephonic informal hearing was conducted on November 16, 2000. Special Deputy Commissioner Ronnie E. Rowell entered an Order filed November 27, 2000 deferring ruling on defendant's motion and referring this case to hearing before a Deputy Commissioner.
Plaintiff also filed a Form 33 Request that Claim be Assigned for Hearing on October 23, 2000 alleging that defendant had stopped payments of disability benefits without an Order of the Industrial Commission. Defendant filed a Form 33R Response to Request that Claim be Assigned for Hearing on or about December 1, 2000 contending that plaintiff was entitled to no further benefits and defendant was entitled to a credit for certain payments.
Both the Form 24 proceeding and the Form 33 filed in this case raise essentially the same questions of fact and law. The parties submitted a pre-trial agreement at the hearing before the deputy commissioner stating the issues to be determined as follows:
 1. Is plaintiff's current medical and psychological condition causally related to her compensable injury of July 1, 1999?
 2. Is plaintiff entitled to payment of medical expenses with Cape Fear Valley Medical Center and Fayetteville Family Medical Center and for any diagnostic testing performed at the recommendation of physicians in those facilities?
 (This issue was resolved by the parties and memorialized in an Order filed June 5, 2001; therefore, this issue was not addressed by Chief Deputy Commissioner Gheen and is not addressed in this opinion.)
 3. Is plaintiff entitled to ongoing medical treatment for injuries sustained in the compensable accident arising out of and in the course of her employment?
 4. Was plaintiff offered suitable employment with defendant-employer?
 5. Is plaintiff entitled to reasonable attorney's fee pursuant to N.C. Gen. Stat. § 97-88.1?
 6. Has plaintiff been disabled within the meaning of the Act at any time after August 3, 2000?
 7. Is plaintiff barred from receiving benefits after August 3, 2000 because of her refusal to accept employment made available by defendant-employer?
 8. What additional benefits, if any, is plaintiff entitled to recover?
 9. What amount of credit, if any, are defendants entitled to receive for overpayment of weekly disability benefits?
 ***********
Based on the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was fifty-five (55) years old at the time of the deputy commissioner hearing in this matter. Plaintiff's work history includes employment as a cashier with Wilco from 1990 to 1991 and operating an in-home business inputting information into a computer for a publishing company. Plaintiff has a college education, received dental assistant training, and obtained a real estate license while living in another jurisdiction. Defendant hired plaintiff on November 20, 1994 at Store 127 as a cashier and ultimately promoted her to Customer Service Manager in 1997.
2. Plaintiff's job duties as Customer Service Manager for defendant included: training other store personnel, preparing employee work schedules, assisting customers, assisting cashiers and baggers as necessary, and responsibility for monies. Plaintiff's position also entailed some manual labor including reaching, bending, stooping, and lifting up to ten pounds; however, plaintiff's tasks primarily focused on communication skills and the ability to prepare paperwork and utilize a computer. In addition, plaintiff also served as manager on duty when the store manager was not present.
3. Plaintiff slipped on some grapes on the floor while working on July 1, 1999. Plaintiff grabbed the conveyor near a cash register with her right arm in an attempt to break her fall. At that time, plaintiff felt and heard something "pop" in her right extremity and experienced immediate pain.
4. Plaintiff sought medical treatment on July 1, 1999 from Dr. Patricia Miller, a general family practitioner. Dr. Miller diagnosed a sprain of plaintiff's neck and upper right arm and took her out of work. Dr. Miller released plaintiff to return to work with restrictions, and she returned to light duty work with defendant on September 5, 1999. Defendant filed a Form 60 dated September 7, 1999 admitting plaintiff's disability as of July 1, 1999 and appropriately paid temporary total disability benefits to plaintiff from July 1, 1999 through September 4, 1999, and temporary partial disability benefits to plaintiff from September 5, 1999 through September 11, 1999.
5. Dr. Miller later referred plaintiff to Dr. Neil Conti, an orthopedic surgeon with Pinehurst Surgical. On September 7, 1999, Dr. Conti diagnosed plaintiff's conditions as right carpal tunnel syndrome, right trapezial strain, and right shoulder tendonitis. Dr. Conti also recommended an EMG be performed, but plaintiff elected not to proceed with that exam. Dr. Conti released plaintiff to return to full duty work on September 12, 1999.
6. Plaintiff subsequently returned to her regular duties without absences from work or additional medical treatment for her compensable injury for approximately five months. On February 22, 2000, plaintiff returned to Dr. Conti with continuing right arm pain. Dr. Conti again recommended an EMG and nerve conduction study. Dr. Conti assigned work restrictions consisting of no overhead use of the right arm and no lifting greater than one pound with the right arm for a period of two weeks. Three days later, Dr. Conti completely removed plaintiff from work until April 5, 2000.
7. Plaintiff underwent an EMG/nerve conduction study on April 4, 2000, which was normal for carpal tunnel syndrome (CTS) in plaintiff's right extremity but demonstrated CTS in her left extremity about which she had had no prior complaints since the date of her injury, July 1, 1999. Plaintiff also reported to Dr. Conti on this date that she was experiencing a burning sensation in her right extremity with swelling and redness in her right hand. Based solely on plaintiff's reports which were contradicted by the EMG/nerve conduction study which did not indicate any abnormalities, Dr. Conti tentatively diagnosed plaintiff as having reflex sympathetic dystrophy (now denominated and herein referred to as complex regional pain syndrome [CRPS]) of the right extremity. Plaintiff later underwent a triple bone scan on April 11, 2000 to confirm the CRPS diagnosis; however, Dr. Conti found that these test results, in fact, did not support a diagnosis of CRPS in the right extremity.
8. Thereafter, Dr. Conti again saw plaintiff on April 25, 2000. Although plaintiff still had physical symptoms consistent with CRPS of the right hand at this visit, Dr. Conti released plaintiff to return to light duty work with restrictions of no repetitive motion and no lifting greater than one pound with the right extremity for six weeks. Dr. Conti stated in his deposition testimony that patients with CRPS should engage in as much activity of the injured extremity in spite of pain as a part of the treatment regimen whether it be in conjunction with work or otherwise.
9. Plaintiff was next examined by Dr. Conti on May 30, 2000 and reported that she was experiencing increased right shoulder symptoms. MRI images of plaintiff's right shoulder captured on June 8, 2000 excluded any rotator cuff injury thus ruling out her shoulder as a cause of her ongoing right extremity condition. Dr. Conti felt that the same work restrictions previously given to plaintiff at her April 25, 2000 visit were still applicable based on her condition on this date.
10. Physical therapy, occupational therapy, and pain clinic consultation recommended by Dr. Conti were timely provided to plaintiff. Although an appointment with the Pinehurst Pain Clinic was scheduled for plaintiff in June 2000, plaintiff opted to cancel this appointment and instead be evaluated by Dr. Thomas Kern Carlton, III in Charlotte upon recommendation of her attorney.
11. Dr. Thomas Kern Carlton III, physical medicine and rehabilitation specialist, conducted an independent medical examination of plaintiff on June 22, 2000. Upon examining plaintiff, Dr. Carlton found no CRPS symptoms such as swelling, skin discoloration, or temperature change. Dr. Carlton also stated that plaintiff demonstrated more pain behavior during her examination than he would have expected given her lack of physical symptoms. Dr. Carlton also testified that it was somewhat unusual that plaintiff had not reported symptoms indicative of CRPS closer to the time of the original injury and that none of the diagnostic studies undergone by plaintiff showed any objective findings that would support a diagnosis of CRPS. Although Dr. Carlton stated that plaintiff might be suffering from CRPS, he was not asked to and did not relate this condition to plaintiff's original injury incurred on July 1, 1999. In any event, Dr. Carlton felt that plaintiff was capable of left-handed work and should have used her injured right hand as much as possible even while experiencing pain as part of a treatment plan in order to improve her right hand condition. Dr. Carlton also agreed that plaintiff was capable of performing the pre-maximum medical improvement job duties described in defendant's letter dated July 27, 2000 offering plaintiff such work.
12. By July 18, 2000, Dr. Conti was uncertain of the cause of plaintiff's symptoms and whether she had CRPS based on his physical examination which detected no right extremity atrophy or significant swelling as usually seen in such patients, normal EMG/nerve conduction test, and normal bone scan. As of this visit, Dr. Conti essentially had no diagnosis of plaintiff's condition because his treatment, designed to alleviate symptoms if plaintiff had CRPS, appeared to have worsened her condition. Dr. Conti therefore recommended that plaintiff be referred to a physician specializing in hand disorders for continued treatment.
13. At her July 18, 2000 visit, Dr. Conti also released plaintiff to return to work with restrictions limiting plaintiff's work activities to using only her left hand. Dr. Conti testified that by this time plaintiff was clearly able to perform "light duty" left-handed work, and even if plaintiff did have CRPS, his return to work recommendations including using her right arm would have been part of his treatment plan. Dr. Conti stated that activity either in the form of therapy, work, or exercise is a mainstay of CRPS treatment because mobilization, or movement, of the joints tends to help the underlying condition of stiff or swollen joints. Dr. Conti said it was important for plaintiff to be active and use her right arm as much as possible, and that had she attempted to do so, she might have improved her condition and reduced her disability.
14. Upon referral by Dr. Conti, Dr. James Post of the Raleigh Hand Center examined plaintiff on August 11, 2000. Dr. Post is board certified in orthopedic surgery and, at the time of his deposition, was awaiting certification in hand surgery. Dr. Post specifically noted that plaintiff's degree of pain was inconsistent with her presentation. Dr. Post expected that if plaintiff had CRPS, she would likely experience increased sweat patterns, color changes of the hand, and swelling; however, Dr. Post did not detect any of these symptoms. Additionally, plaintiff represented that due to her right extremity pain she could not use her right arm. Upon examination, however, Dr. Post did not find atrophy of the muscles of the right hand or forearm which is inconsistent with non-usage of the extremity. Based upon his physical examination including no objective signs of CRPS, plaintiff's presentation, and review of plaintiff's diagnostic studies, Dr. Post concluded that plaintiff did not have CRPS or any other condition he typically treats in the right upper extremity. Dr. Post also went on to state in his deposition testimony that plaintiff's case was the first time he had ever made a notation in a patient's records that her complaints might very well be "fictitious."
15. At this one and only visit on August 11, 2000, Dr. Post stated the following in his medical records, "I think it would be very healthy for her to get back to gainful employment even if this requires her being back at one handed duties. . . . I think left handed duties are appropriate at this point and would return her to work immediately." Dr. Post explained that appropriate return to work activity coupled with significant physical therapy is beneficial for CRPS patients in the long run. Dr. Post felt that plaintiff had already received adequate physical therapy during the course of her treatment and therefore felt it clinically appropriate that she be released to return to left handed work immediately and released her from his care. Dr. Post also stated during his deposition that plaintiff could have worked in the pre-maximum medical improvement position offered by defendant. Dr. Post did not state in his deposition whether or not plaintiff's symptoms, if they were in fact existent, were causally related to her July 1, 1999 compensable injury.
16. Drs. Carlton and Post also recommended plaintiff undergo a cervical MRI which was performed on August 29, 2000. All of plaintiff's treating physicians who have examined the cervical MRI exam report agree that any cervical abnormalities are not the cause of plaintiff's right extremity condition.
17. On October 3, 2000 plaintiff was examined by Dr. Zane Walsh who is board certified in physical medicine and rehabilitation and electrodiagnostic medicine. Plaintiff failed to disclose to Dr. Walsh at the time of her examination that she had returned to work in early September 1999 through February 25, 2000 following her July 1, 1999 compensable injury. Dr. Walsh's observations and tests revealed results similar to those documented by plaintiff's previous treating physicians. Specifically, Dr. Walsh observed that plaintiff's active or self-directed range of motion was self-limited compared with his passive manipulation of the right arm, or in other words, plaintiff's range of movement improved with distraction. Dr. Walsh also found no atrophy or skin discoloration of plaintiff's right extremity as normally seen in CRPS patients and included in his medical notes that her fingernails were painted. Dr. Walsh also felt that plaintiff's reports of pain were out of proportion to his objective findings.
18. Upon review of all of plaintiff's diagnostic tests and physical exam which included no objective signs of any condition or injury that would account for plaintiff's right extremity pain and limitations, Dr. Walsh concluded that plaintiff did not have CRPS. Instead, Dr. Walsh diagnosed plaintiff's right upper extremity condition based solely on her own complaints without any objective evidence as "chronic pain" meaning pain for more than six months.
19. Dr. Walsh opined that plaintiff was capable of working with her left hand and should use her right extremity as much as possible without continued repetitive motion or lifting of the arm. In Dr. Walsh's opinion, plaintiff's active use of her right arm was important to the betterment of her condition, could lessen her disability, and would cause her no physical harm. Dr. Walsh encouraged plaintiff to continue her home exercise program and use her right arm as much as possible and recommended a trial of some medication. Dr. Walsh, during his deposition, also examined a copy of defendant's pre-maximum medical improvement job duties for plaintiff and approved them as within her physical restrictions at the time the job was offered.
Dr. Walsh had no opinion as to whether plaintiff could have been suffering from any psychological problems that could have affected her right extremity pain. Dr. Walsh also expressed no opinion as to whether or not plaintiff' symptoms were causally related to her July 1, 1999 injury.
19. In summary, none of plaintiff's treating physicians or those she has visited for independent medical examinations have causally related her July 1, 1999 injury to her ongoing right upper extremity condition to a reasonable degree of medical certainty at anytime after July 18, 2000.
20. By October 2000, despite the medical treatment recommendations and release to return to work with restrictions of plaintiff's treating physicians, Dr. Conti, Dr. Carlton, Dr. Post, and Dr. Walsh, plaintiff continued to refuse to make any attempt to return to work in the pre-maximum medical improvement position offered by defendant. Instead, plaintiff obtained a referral from her family physician to the Pain Management Center of Cape Fear Valley Health Systems for additional treatment she deemed necessary.
21. On October 25, 2000, plaintiff was examined upon her family physician's referral by Dr. Kenneth Oswalt, a board certified anesthesiologist and pain medicine specialist with the Pain Management Center of the Cape Fear Valley Health System. Plaintiff complained to Dr. Oswalt of right shoulder, right upper extremity, and right-sided neck pain. At this time, Dr. Oswalt concluded that plaintiff's physical exam and history were consistent with CRPS or some sympathetically mediated variant; however, he gave no opinion as to whether the cause of plaintiff's right upper extremity condition was the July 1, 1999 compensable injury. Dr. Oswalt wrote plaintiff out of work for one month while she was participating in the pain management program, prescribed a battery of medications, and recommended she see a psychologist and participate in a pain behavior modification program.
22. Plaintiff returned to Dr. Oswalt for further evaluation on December 11, 2000. At this visit, Dr. Oswalt manipulated plaintiff's shoulder under sedation and determined that the right extremity was capable of a full range of motion thereby indicating that plaintiff's report of non-movement of her shoulder was not due to any mechanical problem. Dr. Oswalt also recommended at this visit that plaintiff undergo a stellate ganglion block as a further diagnostic procedure to determine if a sympathetic component of the pain existed.
23. On January 22, 2001, plaintiff declined the stellate ganglion block due to concerns regarding the perceived invasive nature of the procedure and Dr. Oswalt instead prescribed the Catepres patch regimen in an attempt to alleviate her ongoing right upper extremity pain. The Catepres patch releases medication slowly into the patient's body and accomplishes a similar result to the ganglion block, opening the blood vessels to improve blood flow.
24. At her February 16, 2001 visit with Dr. Oswalt, plaintiff reported that the Catepres patch improved her symptoms; thus, Dr. Oswalt opted to continue with this treatment and recommended plaintiff again engage in physical therapy to work on her right extremity range of motion and visit a pain psychologist.
25. Plaintiff again returned to Dr. Oswalt on March 1, 2001. During this examination, plaintiff suffered a "spell" which consisted of increased pain and minimal discoloration and light mottling of the right hand. After the "spell," plaintiff reported that the pain was lessening and the discoloration resolved. Dr. Oswalt's visit notes do not reflect the presence of any other objective indicators of CRPS such as temperature or sweat pattern changes at the time the "spell" occurred. Dr. Oswalt included in his visit notes that he specifically discussed with plaintiff for five to ten minutes the importance of using the right extremity as much as possible despite her pain to minimize any secondary complications that may be associated with disuse and deconditioning.
26. Pursuant to Dr. Oswalt's recommendation, Thomas Kern, Ph.D. conducted a psychological evaluation of plaintiff on April 6, 2001 and diagnosed plaintiff with adjustment disorder with depressed mood and chronic pain disorder associated with plaintiff's general medical condition and life struggles including loss of her husband and living with adult children, one with Down's Syndrome; however, he did not directly relate plaintiff's psychological problems to her compensable injury. Dr. Kern recommended plaintiff participate in biofeedback training and supportive counseling for four to ten visits which she began receiving from Dr. Kern on April 11, 2001 and continued until at least June 18, 2001, which is the date of the last medical note included in the evidentiary record. Dr. Kern also diagnosed plaintiff with CRPS; however, considering Dr. Kern's level of expertise, as he is not a medical doctor, his opinion regarding plaintiff's right upper extremity condition is given little weight.
27. Plaintiff again visited Dr. Oswalt on May 8, 2001 and May 16, 2001 at which times the Catepres patch regimen and her other medications were continued. Dr. Oswalt's May 16, 2001 visit notes also contain the following quotes, ". . it would be good for the patient to try returning back to work utilizing her unaffected hand. .," and "She needs to increase her activity level. She needs to increase her use of right upper extremity as much as possible." Dr. Oswalt again mentioned in these notes the necessity of plaintiff undergoing a diagnostic stellate ganglion block to determine whether there was any sympathetic component to her pain.
28. Plaintiff returned to Dr. Oswalt on May 16, 2001 at which time he again recommended she undergo the stellate ganglion block procedure to assess any sympathetic component to her pain. At this visit, Dr. Oswalt also felt it appropriate that plaintiff return to work using her unaffected hand. However, plaintiff informed Dr. Oswalt at her next visit on June 5, 2001 that she had elected not to proceed with the diagnostic stellate ganglion block until her depression was under better control.
29. Dr. Oswalt stated that patients with plaintiff's symptoms should use the affected extremity as much as possible and opined that it would have been therapeutic and beneficial for plaintiff to return to work with appropriate work restrictions and monitoring. Dr. Oswalt went on to say during his deposition that plaintiff would have benefited from increased activity and social interaction at work or elsewhere as it would have serve as distraction therapy from her pain. Further, Dr. Oswalt stated that ideally plaintiff should have been released to perform one-armed work utilizing her left arm and allowing her to use her right arm as she felt capable and that he would have recommended that she at least try such work. In summary, Dr. Oswalt felt that it would have been beneficial for plaintiff to perform the pre-maximum medical improvement position offered by defendant.
30. On May 2, 2001, Dr. Glenn Subin with MidSouth Orthopaedics conducted an independent medical evaluation of plaintiff at defendant's request. Dr. Subin stated in his medical notes that plaintiff's symptomatology seemed significantly out of proportion to his physical findings and she demonstrated significant pain exaggeration behavior. Dr. Subin found no evidence of atrophy in plaintiff's right hand. During Dr. Subin's testing, plaintiff was unable to generate any grip strength when tested with the Jaymar dynamometer on the left or right side and exhibited exaggerated pain response with shallow breathing and tenseness. However, while undergoing x-rays, plaintiff was able to hold two heavy folders of x-rays with her left hand without difficulty. Dr. Subin also felt that plaintiff could perform at least one-handed work using her left arm and concluded that plaintiff was experiencing right upper extremity pain of unclear etiology and did not causally relate her condition to her July 1, 1999 compensable injury.
31. Drs. Post and Walsh agree that plaintiff does not have CRPS and Dr. Subin stated that the cause of plaintiff's right upper extremity condition was unknown. Only non-authorized providers psychologist Dr. Kern and Dr. Oswalt, have diagnosed plaintiff with CRPS; even so, Dr. Oswalt did not have an opinion as to the cause of plaintiff's CRPS and Dr. Kern's opinion regarding CRPS is afforded little weight because he is not a board certified physician and his professional credentials are limited to psychology. Moreover, Dr. Oswalt testified that CRPS, is "not really a diagnosis," rather it is the name given to a complex of symptoms and it is "not a disease in and of itself," and describes a situation where the etiology of pain, the cause of the complex of symptoms, is still undetermined.
32. None of the medical treatment plaintiff received from Dr. Oswalt or Dr. Kern was authorized by defendant at the time it was received. While the diagnoses of chronic pain, CRPS, and depression were shared by non-authorized providers Dr. Oswalt and psychologist Dr. Kern, even they agree that her return to work would be medically appropriate and that plaintiff's complaints have a psychological component. These findings regarding the psychological aspect of plaintiff's pain complaints are supported by the greater weight of the evidence in the form of the independent medical evaluations of three separate physicians, Drs. Post, Subin, and Walsh who found plaintiff's complaints were exaggerated.
 II. PLAINTIFF'S LACK OF PARTICIPATION IN DEFENDANT'S TEMPORARY ALTERNATE DUTY (TAD) PROGRAM
33. When plaintiff was released to return to work with restrictions by Dr. Conti on July 18, 2000, she became eligible to participate in defendant's Temporary Alternate Duty (TAD) program for injured workers. Mr. John Corriher, employee assistance program manager, stated that this program serves as pre-maximum medical improvement employment only for employees with compensable workers' compensation claims to enable them to return to work as soon as medically appropriate within the restrictions assigned by their treating physician. Mr. Corriher also stated that the TAD program does not try or intend to put injured employees in permanent positions. Defendant's employees with medical conditions and/or work restrictions that are not the result of a work-related injury are not eligible to participate in defendant's TAD program. After an employee who has incurred a work-related injury is released with temporary work restrictions prior to reaching maximum medical improvement, defendant's TAD program administrators consult with supervisors at the store or location where the injured employee worked and determine what duties are within the employee's work restrictions. The tasks assigned to the employee are regular duties that are performed by permanent employees, but tasks may be combined from several different permanent positions at defendant's worksite to ensure all of the pre-maximum medical improvement job duties are within the temporary work restrictions imposed by the treating physicians. While participating in defendant's TAD program, the employee is paid minimum wage for the time worked and in addition temporary partial disability benefits based on any reduction in earnings. Upon assignment of permanent work restrictions, injured employees are no longer eligible to participate in defendant's TAD program.
34. Michelle Smith, Return to Work Administrator for defendant, wrote plaintiff on July 27, 2000 explaining the TAD program. This letter specifically informed plaintiff that in this program, "an injured Workers' Compensation employee who has been released from the doctor with restrictions is temporarily assigned to a new job (outside of theirnormal one) with very light physical demands." (emphasis added). This letter also stated that plaintiff had been assigned work restrictions by her physician including "one handed work only," and "no use of right arm," and that given those restrictions, plaintiff would perform the following duties:
 1. Dust shelving and/or equipment, within restrictions
2. Help face light items, within restrictions
3. Push dust mop, within restrictions.
This letter requested plaintiff return to work in this position on August 3, 2000 at 10:00AM at her home store.
35. Plaintiff did not report to work on August 3, 2000. Plaintiff contends that she did not receive the letter offering her the TAD job until after August 3, 2000. Even so, plaintiff did not respond to the letter when she contends it was received despite its clear statement in the third paragraph as follows:
 "If you do not contact me and do not report for duty, we will interpret this as a lack of desire on your part to continue employment with our company. If you have any questions, please feel free to contact me at the above number."
Plaintiff also testified that she focused on the minimum wage aspect of the pre-maximum medical improvement TAD position and in addition did not believe she could perform some of the tasks mentioned in defendant's letter one-handed.
36. It is undisputed that plaintiff did not contact anyone with defendant to express her concerns about the position being offered not being within her work restrictions or physical capabilities or suggest that she might be able to do some other work in the store or to even consider attempting any of the duties outlined in the letter. Mr. Corriher stated that employees in the TAD program who attempt to return to work may have their light duty job specifications modified so long as they are consistent with their work restrictions. Mr. Royace Thorne, plaintiff's store manager, also testified that that there were ample other tasks at defendants' work site only requiring one hand that were part of plaintiff's previous job duties including vendor receiving, verbally communicating with new employees such as cashiers and baggers to assist in their training regarding defendant's proper store procedures, performing test checks on the cashiers, monitor voids and refunds, performing POU or produce I.D. number checks, and customer service and monitoring of the front end of the store. Plaintiff's failure to initiate any contact with defendant regarding her return to work precluded defendant from even having the opportunity to address plaintiff's concerns and resolve any disputed issues concerning appropriate pre-maximum medical improvement TAD job duties given her work restrictions thereby satisfying the objectives of vocational rehabilitation.
37. Finally, plaintiff also testified that she could not return to work with defendant because she had been diagnosed with CTS in her left hand that was symptomatic. While the record supports the fact that the EMG was positive for CTS in the left hand, none of the extensive medical records from the two physicians treating plaintiff prior to defendant's offer of pre-maximum medical improvement TAD employment indicate that plaintiff ever reported left hand symptoms or complaints related to CTS. Plaintiff's testimony is afforded little to no weight and, moreover, illustrates a desire to avoid work, which all of plaintiff's authorized and even non-authorized treating physicians opined would be medically appropriate.
38. The testimony of Drs. Post, Subin, and Walsh that plaintiff's symptoms were out of proportion to any objective findings is accepted as competent and credible and is therefore given great weight by the Commission. Plaintiff's testimony that she could not perform the duties required by defendant's pre-maximum medical improvement TAD job is contrary to the greater weight of the competent medical evidence, and therefore given little weight by the Commission. Defendant clearly advised plaintiff in the July 27, 2000 letter offering the pre-maximum medical improvement TAD job that all duties assigned would be within her medical restrictions. Plaintiff contended that she (a) "knew" that she could not perform the duties one handed and (b) had CTS in her left hand that was symptomatic. The record does establish that plaintiff had a positive nerve conduction study of the left hand; however, nothing in the medical records through July 18, 2000 supports her testimony that the left hand was previously symptomatic since the date of her injury, July 1, 1999.
39. The greater weight of the lay and medical evidence taking into consideration the medical records and opinions of all of plaintiff's authorized treating physicians clearly supports a finding that as of August 3, 2000, plaintiff was not at maximum medical improvement but was capable of performing left handed and non-repetitive right handed work. Plaintiff's medical providers indicate that plaintiff would benefit by a return to work and her failure to do so has slowed her rehabilitation and interfered with her recovery. Even though Dr. Oswalt felt plaintiff suffered from depression, he still specifically stated that it would be beneficial for plaintiff to at least attempt to return to work in a light duty capacity within her physical work restrictions; thus, as of this date, plaintiff was capable of returning to work despite any mental condition she was experiencing that may or may not have been related to her compensable injury of July 1, 1999. The pre-maximum medical improvement TAD position offered to plaintiff was within her assigned work restrictions and appropriate to her capacity and would have been medically and therapeutically rehabilitative.
40. Defendant's efforts to provide plaintiff with light-duty, pre-maximum medical improvement employment within her physical restrictions through the TAD program constitute vocational rehabilitation subject to the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals applicable to this case pursuant to Section I.A.1. which states as follows:
"I. Application of the Rules
A. These rules apply to:
 1. All cases in which the employer is obligated to provide or is providing and the injured worker is obligated to accept medical compensation under the Act, or in which such compensation is provided by agreement . . ."
41. Mr. John Corriher, defendant's employee assistance program manager, testified that all employees are automatically removed from defendant's active payroll who have not received a paycheck within a twelve month period. Although plaintiff was removed from defendant's active payroll on March 26, 2001 because she had not reported to work or received a paycheck in the preceding twelve months, she remains eligible to participate in defendant's pre-maximum medical improvement TAD employment program and will return to the active payroll upon her return to the position provided within her work restrictions.
42. Plaintiff was removed from defendant's active payroll after twelve months without receiving a paycheck. Plaintiff's failure to perform or even attempt to perform suitable light duty or rehabilitative work offered by defendant constitutes a conscious decision by plaintiff which led to her removal from defendant's active payroll or effective termination.
43. Plaintiff's removal from defendant's active payroll and effective termination was due to her own misconduct in refusing to return or even attempt to return to work within her restrictions in a suitable pre-maximum medical improvement, light duty position; it was not due to her compensable injury.
44. All employees of defendant are removed from defendant's active payroll and effectively terminated after not receiving a paycheck for twelve months as they are deemed to have voluntarily resigned. Since plaintiff's failure to work for defendant was due to her own conscious decision to refuse to return or even attempt to return to suitable light duty or rehabilitative employment within her restrictions, plaintiff was not treated any differently than any other employee who failed to show up to work. Plaintiff may be reinstated on defendant's active payroll upon her return to suitable light duty or rehabilitative work.
45. Plaintiff cannot satisfy any of the methods of proving temporary total disability at any time after August 3, 2000. First, plaintiff has produced no medical evidence that she is totally disabled, and in fact, the greater weight of the medical evidence is clearly to the contrary. None of plaintiff's medical providers have causally related to a reasonable degree of medical certainty plaintiff's left or right upper extremity symptoms or psychological condition to her July 1, 1999 compensable injury. Second, plaintiff has not shown that she has engaged in any job search and unsuccessfully attempted to locate employment. On the contrary, the undisputed evidence in this case shows that defendant offered plaintiff pre-maximum medical improvement work within her restrictions. Finally, plaintiff has not proven that it would be futile for her to attempt work. In fact, the greater weight of the evidence indicates that it would actually be appropriate for plaintiff to perform pre-maximum medical improvement work within her restrictions and that the work activity itself could reduce her period of disability. In summary, plaintiff has failed to prove ongoing total disability resulting from her July 1, 1999 work-related injury.
46. Plaintiff has not yet been assigned any permanent partial disability ratings related to her compensable injury of July 1, 1999.
47. Defendant has not engaged in stubborn, unfounded litigiousness during the course of defending this claim.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW I. DISABILITY
1. The Form 60 Employer's Admission of Employee's Right toCompensation filed by defendant establishes that plaintiff suffered a compensable injury by accident to her right upper extremity on July 1, 1999 for which defendant is liable. The filing of a Form 60 does not establish disability; plaintiff has the burden to present evidence to establish ongoing disability. N.C. Gen. Stat. § 97-18(d); Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154, 542 S.E.2d 277 (2001).
2. Plaintiff bears the burden of proof by the greater weight of the evidence that she is disabled and the extent of her disability within the meaning of the Act. Sims v. Charmes/Arby's Roast Beef, 142 N.C. App. 154,542 S.E.2d 277 (2001). Disability is the "incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or any other employment." N.C. Gen. Stat. § 97-(2)(9);Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). To support a conclusion of disability, the plaintiff must prove and the Industrial Commission must find that: (1) plaintiff was incapable after her injury of earning the same wages earned prior to injury in the same employment, (2) plaintiff was incapable after her injury of earning the same wages she earned prior to injury in any other employment, and (3) plaintiff's incapacity to earn wages was caused by her compensable injury. Hilliard, 305 N.C. at 595, 290 S.E.2d at 683. Disability can be total or partial in nature, and it can be temporary or permanent in duration. N.C. Gen. Stat. §§ 97-29, 97-30, 97-31. Further, the question is whether plaintiff is incapable of work in any employment. See Demeryv. Perdue Farms, 143 N.C. App. 259, 545 S.E.2d 485 (2001).
3. Plaintiff has established by the greater weight of the evidence that she was totally disabled as a result of her work related accident from July 1, 1999 through September 4, 1999, partially disabled from September 5, 1999 through September 12, 1999, and again totally disabled from February 22, 2000 through August 2, 2000. Plaintiff was entitled to appropriate disability benefits at the rate of $312.02 per week during these time periods that have already been paid by defendant. N.C. Gen. Stat. § 97-29.
4. Where the nature of the injury alleged involves complicated medical questions, only an expert can give competent evidence as to causation.Click v. Freight Carriers, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). Further, "although expert testimony as to the possible cause of a medical condition is admissible if helpful to the jury, it is insufficient to prove causation, particularly `when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation.'" Holley, 357 N.C. at 233, 581 S.E.2d at 753 (2003) (quotingYoung v. Hickory Bus. Furniture, 353 N.C. 227, 230, 538 S.E.2d 912, 915
(2000)) (internal citation omitted). Causation of plaintiff's upper extremity condition involves complicated medical questions; thus, it is necessary for plaintiff to establish through expert medical evidence that her upper extremity condition is causally related to her July 1, 1999 compensable injury.
5. The greater weight of the expert medical evidence including both the medical records and deposition testimony of all of plaintiff's treating physicians is insufficient to prove causation of plaintiff's upper extremities conditions as all of these physicians' opinions do not rise above the level of a guess or mere speculation. As plaintiff has failed to meet her ongoing burden of proving that her upper extremities conditions are causally related to her July 1, 1999 injury, defendants are entitled to suspend plaintiff's workers' compensation benefits as of the date of filing of the Form 24 application. N.C. Gen. Stat. § 97-29.
 II. REFUSAL OF SUITABLE EMPLOYMENT
6. Critical to the Workers' Compensation Act's overall compensation scheme is the requirement that an employee return to work when medically capable of doing so. N.C. Gen. Stat. § 97-32 of the Act provides that an injured employee who refuses "employment procured for him suitable to his capacity shall not be entitled to any compensation at any time during the continuance of the refusal." As this statute makes no differentiation between the standards for unjustified refusal of suitable employment for pre-maximum medical improvement and post-maximum medical improvement claimants, the Full Commission must determine the issues of this case based upon prior appellate rulings involving comparable factual situations of unjustified refusal of suitable employment where the claimant has not yet reached maximum medical improvement.
7. Determination of what is "suitable" employment within the meaning of N.C. Gen. Stat. § 97-32 must be based on the employee's medical situation at the time in question. In the context of pre-maximum medical improvement employment, suitability is determined by comparing job duties of the "light duty" or rehabilitative work with the physical restrictions of the employee. Oliver v. Lane Co., 143 N.C. App. 167, 544 S.E.2d 606,608 (2001). If the "light duty" or rehabilitative work is within the employee's physical restrictions, then it cannot be refused by the employee. Id.
8. The pre-maximum medical improvement or light duty or rehabilitative employment offered to plaintiff does not conflict with the definition of "suitable employment" in Rule III.G. of the North Carolina Industrial Commission Utilization of Rehabilitation Professionals in Workers' Compensation Cases in light of the Purposes of these Rules as stated in Section II which includes discouragement of the pursuit of plans or purposes which impede or conflict with the party's progress toward that goal.
Rule III.G. states as follows:
 "Suitable employment" means employment in the local labor market or self-employment which is reasonably attainable and which offers an opportunity to restore the worker as soon as possible and as nearly as practicable to pre-injury wage, while giving due consideration to the worker's qualifications (age, education, work experience, physical and mental capacities), impairment, vocational interests, and aptitudes. No one factor shall be considered solely in determining suitable employment."
All of plaintiff's treating physicians are in agreement that the pre-maximum medical improvement, light duty TAD position offered by defendant would serve a rehabilitative function and aid in restoring her as soon as possible and as nearly as practicable to her pre-injury wage given her condition. These physicians all stated that the pre-maximum medical improvement, light duty TAD job was within her physical restrictions and it would be therapeutic and beneficial for her to participate in such work. Given plaintiff's age, post-secondary education experiences, stellar prior employment record including approximately five years working for defendant and promotion to Customer Service Manager, and physical and mental abilities to perform such work in light of her degree of impairment, and her treating physician's opinions that engaging in some form of work was necessary to restore her as soon as possible to her pre-injury wage, the Full Commission finds that the pre-maximum medical improvement, light duty TAD position constitutes suitable employment for plaintiff.
9. The standard for suspension of disability compensation for unjustified refusal of pre-maximum medical improvement employment is distinctly differently from the standards used to determine suitability of post-maximum medical improvement employment. Saums v. RaleighCommunity Hospital, 346 N.C. 760, 487 S.E.2d 746 (1997) and Peoples v.Cone Mills Corporation, 316 N.C. 426, 342 S.E.2d 798 (1986) both addressed the employment situations of claimants who had reached maximum medical improvement. As the employee in this case has not yet reached maximum medical improvement, the determination of whether or not the light duty job offered to her is "suitable employment" is not governed by the standards enunciated in those cases.
10. The Court of Appeals addressed a highly analogous factual situation to this case involving a determination of refusal of suitable employment by a claimant who had not yet reached maximum medical improvement and was terminated for misconduct by defendant-employer in the case of Seagravesv. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397, (1996); therefore, the Full Commission adopts the governing principles of this case for use in analyzation of the issues in this matter.
11. The Court of Appeals stated the issue in Seagraves as "whether an employee, who is disabled as a result of a compensable injury and is provided with light duty employment by the employer, constructively refuses the light duty work and forfeits workers' compensation benefits for such disability pursuant to the statute upon termination of the employment for fault or misconduct unrelated to the compensable injury."Id. at 230 and 399. The plaintiff in this case is similarly situated as she had been offered light duty work and had not yet reached maximum medical improvement at the time of her termination just as the employee in the Seagraves case; thus, the Seagraves test is the appropriate standard for determining plaintiff's entitlement to ongoing disability benefits.
12. In Seagraves, p. 401 and 233-234, the Court of Appeals held as follows:
 ". . . where an employee, who has sustained a compensable injury and has been provided light duty or rehabilitative employment, is terminated from such employment for misconduct or other fault on the part of the employee, such termination does not automatically constitute a constructive refusal to accept employment so as to bar the employee from receiving benefits for temporary partial or total disability. Rather, the test is whether the employee's loss of, or diminution in, wages is attributable to the wrongful act resulting in loss of employment, in which case benefits will be barred, or whether such loss or diminution in earning capacity is due to the employee's work-related disability, in which case the employee will be entitled to benefits for such disability. Therefore, in such cases the employer must first show that the employee was terminated for misconduct or fault, unrelated to the compensable injury, for which a nondisabled employee would ordinarily have been terminated. If the employer makes such a showing, the employee's misconduct will be deemed to constitute a constructive refusal to perform the work provided and consequent forfeiture of benefits for lost earnings, unless the employee is then able to show that his or her inability to find or hold other employment of any kind, or other employment at a wage comparable to that earned prior to the injury, is due to the work-related disability. The application of this rule will, we believe, best achieve fairness to all parties by assuring that an injured employee is awarded benefits for wage loss which is clearly attributable to his or her job-related disability, while protecting employers from liability to employees who engage in intentional, unacceptable conduct while employed in rehabilitative or light duty settings."
13. Subsequent to oral argument of this matter, the Supreme Court issued its ruling in McRae v. Toastmaster, Inc., 358 N.C. 488, 597 S.E.2d 695, (2004), holding that the balancing test applied in Seagraves v. AustinCo. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996) was appropriate to determine whether or not an employee's workers' compensation benefits may be terminated for unjustified refusal of suitable employment. The Supreme Court approved the Seagraves' test stating that it produces results in accordance with the underlying intent of our state's workers' compensation laws and included the following statement in its opinion. McRae v. Toastmaster, Inc., 358 N.C. 488, 494,597 S.E.2d 695, 700, (2004).
 "In our view, the test provides a forum of inquiry that guides a fact finder through the relevant circumstances in order to resolve the ultimate issue: Is a former employee's failure to procure comparable employment the result of his or her job-related injuries or the result of the employee's termination for misconduct? In disputes like the one at bar, the critical area of inquiry in the circumstances of an injured employee's termination is to determine from the evidence whether the employee's failure to perform is due to an inability to perform or an unwillingness to perform."
14. The following portions of the McRae opinion clearly state the Supreme Court's view of proper step-by-step analysis of a case when applying the Seagraves test.
 "Thus, under the Seagraves' test, to bar payment of benefits, an employer must demonstrate initially that: (1) the employee was terminated for misconduct; (2) the same misconduct would have resulted in the termination of a nondisabled employee; and (3) the termination was unrelated to the employee's compensable injury." McRae v. Toastmaster, Inc., 358 N.C. 488, 493, 597 S.E.2d 695, 698, (2004).
 "If, on the one hand, the greater weight of the evidence shows that the former employee is a victim of job-related injuries, the original employer remains responsible for benefit obligations arising out of the employee's job-related injury. Under such circumstances, the fact that the employee was fired for unrelated misconduct is irrelevant because the employee's termination has no bearing on either the employee's existing compensable injury or how that injury affects his or her ability to find other employment. . . .
 On the other hand, if the terminated-for-misconduct employee fails to show by the greater weight of the evidence that his or her inability to find or perform comparable employment is due to the employee's work-related injuries, the employer is then freed of further benefit responsibilities. Under such circumstances, the employee would be held accountable for his or her misconduct, which would be deemed tantamount to a constructive refusal to perform suitable work duties. As a consequence of such refusal, the employee would forfeit the right to benefits, pursuant to section 97-32, which provides that "if an injured employee refuses employment procured for him suitable to his capacity[,] he shall not be entitled to any compensation at any time during the continuance of such refusal." N.C.G.S. § 97-32." Id. at 495 and 700.
15. Defendant has demonstrated that plaintiff was removed from the active payroll or effectively terminated for misconduct as she failed to report or even attempt to perform suitable light duty or rehabilitative work within her restrictions thereby satisfying the first prong of theSeagraves test. Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228,234, 472 S.E.2d 397, 401.
16. Defendant has demonstrated that plaintiff was treated no differently than other employee who failed to report to work in that anyone who does not receive a paycheck for twelve months is removed from defendant's active payroll or effectively terminated from employment thereby satisfying the second prong of the Seagraves test. Id.
17. Defendant has demonstrated that plaintiff's termination or removal from active payroll was unrelated to her compensable injury in that her termination was due to her own wrongful act which was her conscious decision to refrain from performing suitable work and was not related to her compensable injury in that defendant had accommodated her assigned work restrictions by providing suitable light duty or rehabilitative work thereby satisfying the third prong of the Seagraves test. Id.
18. Defendant has successfully met its burden of proof to show that plaintiff has constructively refused suitable work by satisfying all three prongs of the Seagraves test. Plaintiff is not entitled to receive disability compensation during the period of such refusal unless she demonstrates that her inability to find or hold other employment . . . at a wage comparable to that earned prior to the injury is due to the work-related disability and not the circumstances of her termination.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228, 234,472 S.E.2d 397, 401, and McRae v. Toastmaster 358 N.C. 488, 493,597 S.E.2d 695, 699 (2004).
19. Plaintiff has not attempted to return to work with defendant-employer since August 3, 2000 and has not engaged in any job search activities whatsoever since that date despite no admonitions from her treating physicians that she is physically unable to return to work within her physical restrictions. Thus, plaintiff has failed to demonstrate by the greater weight of the evidence that her inability to find or perform suitable employment is due to her work-related injury. Plaintiff's failure to perform work is not due to an inability to perform but is due to an unwillingness to perform; thus, she has constructively refused suitable employment and forfeited her right to benefits during the time of such refusal pursuant to N.C. Gen. Stat. § 97-32. Seagravesv. Austin Co. of Greensboro, 123 N.C. App. 228, 234, 472 S.E.2d 397,401, and McRae v. Toastmaster 358 N.C. 488, 494, 597 S.E.2d 695, 700
(2004).
20. While the Deputy Commissioner held that it is necessary for an employer to obtain an order from the Commission compelling the plaintiff to cease refusal of pre-maximum medical improvement employment prior to filing a Form 24 Application to suspend the plaintiff's compensation, the Full Commission finds that the holding of Maynor v. Sayles BiltmoreBleacheries governs this issue and limits the scope of this requirement of obliging an employer to obtain a Commission order when seeking to compel the employee to comply with medical and/or vocational rehabilitation prior to filing a Form 24 application to suspend compensation, but not for unjustified refusal of suitable employment. Thus, it was unnecessary for defendant in this case to have previously obtained a Commission order compelling plaintiff to engage in pre-maximum medical improvement work approved by plaintiff's authorized treating physician as within her work restrictions prior to filing a Form 24 application for such unjustified refusal of suitable employment. Maynorv. Sayles Biltmore Bleacheries, 116 N.C. App. 485, 448 S.E.2d 382.
21. As plaintiff has engaged in unjustified refusal of employment since August 3, 2000, defendants are entitled to a credit for any payments made to plaintiff after that date against any future sums that may be awarded to plaintiff. N.C. Gen. Stat. § 97-42.
 III. OTHER ISSUES
22. Plaintiff is not entitled to ongoing authorized medical treatment for her compensable injury so long as such treatment is necessary to effect a cure, give relief, or lessen the period of plaintiff's disability until such time as her refusal of suitable employment ceases. N.C. Gen. Stat. § 97-32.
23. The Full Commission reserves the right to rule on any issues concerning plaintiff's entitlement to permanent partial disability benefits that may be awarded to plaintiff should the parties be unable to agree on these matters. N.C. Gen. Stat. § 97-31.
24. As defendant's actions in the course of litigation of this case do not constitute stubborn, unfounded litigiousness, defendant is not responsible for payment of plaintiff's attorney's fees. N.C. Gen. Stat. § 97-88.1.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant's Form 24 Application is hereby granted as of the date of filing, September 26, 2000. Defendant has continued to pay weekly benefits since the date of filing of the Form 24 application and is entitled to a credit for all benefits paid after August 3, 2000 against any future benefits that may be awarded to plaintiff.
2. Plaintiff's workers' compensation benefits shall remain suspended until such time as her refusal of suitable employment ceases.
3. Plaintiff's counsel is entitled to receive attorney's fees in the amount of twenty-five percent (25%) of the sums recovered by plaintiff. In the event that any of the benefits awarded in Paragraph 1 have not been paid, defendant shall pay twenty-five percent (25%) of the unpaid sums to counsel for plaintiff. Should continuing benefits be resumed, defendant shall pay every fourth check to counsel for plaintiff upon exhaustion of the credit for sums already paid to plaintiff.
4. Defendant shall pay the costs.
This the __ day of August 2005.
 S/ ______________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/ ______________________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER